FILED'10 DEC 03 18:12usoc-ore

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

JON R. STRAIN,                                                             09-6264-TC

                              Plaintiff,

        v.                                                    OPINION AND ORDER

ALCAN CABLE/ALCAN PRODUCTS
CORP, a division of Alcan Aluminum
Corporation, foreign corporations,

                              Defendants.
_____

COFFIN, Magistrate Judge:

        Plaintiff Jon R. Strain (Strain) was employed by defendant Alcan Cable (Alcan) as a day shift

employee. Augustin Acosta, who is Hispanic, was Strain's co-worker on the day shift. At the end

of the day shift on September 27, 2008, Alcan Supervisor Mark Remington (Remington) discovered

"GO HOME MEXICAN" written on Acosta's locker in felt-tip marker. Remington reported the

incident to Alcan's Human Resources Manager, Louise Greer (Greer). The next work

day–September 29, Remington and Plant Manager Sean Milner (Milner) told day shift employees

that there would be an investigation of the incident and, if the person who vandalized the locker was

Page 1 - OPINION AND ORDER

found, there would be discipline.

During the investigation, Remington interviewed each of the day shift employees, including Strain. Remington noted that Strain stated that he was called over to see the graffiti on the day of the incident. Two other employees told Remington that Strain was present when they saw the graffiti; that he peered around the corner so he could see it and stated "whoever did that is getting fired." Remington gave his investigation notes and a photo of the graffiti to Greer. Remington and Milner also searched employees' lockers between September 29 and October 1. They found a black felt-tip marker consistent in color and size with the one used to write the graffiti in Strain's locker. This kind of felt-tip marker was ubiquitous among Alcan employees as employees often used such markers during their job. Remington and Milner returned the marker to Strain's locker following their search and reported finding the marker in Strain's locker to Greer.

Greer interviewed all the day shift employees and compared what they told her to Remington's interview notes. Greer states that her notes were consistent with Remington's, except for the notes taken during Strain's interview. Greer observed that Strain told her that he had never seen the graffiti, while Remington's notes indicated that Strain was called over to see what was written on the locker and that other employees reported Strain saw the graffiti. Greer states that she confronted Strain on the inconsistencies, but he denied them. Greer called Remington into the interview, and he confirmed that Strain had reported seeing the graffiti. Strain continued to deny he saw it. Greer states that she did not believe Strain. Greer asked Strain if he kept a felt-tip marker in his locker. According to Greer, Strain told her that he sometimes used such a marker at work, but denied carrying one or keeping one in his locker. According to Greer, she thought this was false because Remington and Milner had reported finding a felt-tip marker in Strain's locker. On October

2, 2008, Alcan  management conducted a second search of Strain's locker, and the felt-tip marker was gone.

Greer asked Strain if he had ever made racial comments at work, and Strain denied making any. Another employee , however, told Greer that Strain once said "they ought to send them all back to Mexico" in reference to Acosta.  Greer interviewed Strain a second time and asked him why he was overheard making racial comments.  Strain again denied such comments.  Greer stated she did not believe Strain's denial. Greer also learned that another employee was in the locker room at 4:20 PM on September 27, 2008 and did not see any writing on the locker.  Strain reported taking his break at 4:30 PM.  The first time the graffiti on the locker was reported was 5:20 PM.  Based on this timing, Greer concluded that Stain had the opportunity to write on the locker.  By this point, Greer believed that Strain had written the graffiti on the locker.

According to Greer she wanted to be as certain as possible that Strain wrote the graffiti. Thus, Alcan hired a handwriting expert and provided him with a photo of the graffiti and samples of Strain's handwriting from his employment application.  The handwriting expert opined that Strain's handwriting matched the handwriting on the locker.  Greer and Milner discussed the results of the investigation, including the handwriting analysis.  The two agreed that Strain had written on the locker and lied during the investigation; acts which violated Alcan's policies and were grounds for termination.  Greer communicated the results of the investigation and decision to terminate Strain Alcan's Human Resources Director, Manufacturing Director, and to Remington–Strain's direct supervisor.  Everyone agreed that Strain had written on the locker and  should be terminated.  Both Greer and Remington believed at the time, and still believe, that Strain wrote on the locker.

On October 13, 2008, Greer and Remington met with Strain and informed him that he was

Page 3 - OPINION AND ORDER

being terminated for lying during an investigation, harassment, and vandalism. Greer stated that, aside from Alcan's legal counsel, the only people she told that Strain was the one who wrote on the locker are Milner, Remington, John De Sousa (Human Resources Director), John Schuhr (Manufacturing Director) and Tim Wittrock (Production Manager). Each of those conversations was in the context of either the investigation or the decision to terminate Strain's employment. Remington only discussed the matter with Wittrock, Milner, and Greer and only in the context of the investigation. After Strain was fired (and obviously not at work), other Alcan employees approached Remington and Greer and asked about Strain. Both Remington and Greer stated that they declined to comment.

Acosta, however, did not believe that Strain had vandalized his locker. Shortly after the incident, when Strain was suspended pending the outcome of the investigation, Acosta approached Greer and told her that Alcan "had the wrong person." Greer asked Acosta why he thought that. Acosta explained that he and Strain had a good relationship and he had no problems with Strain. Greer responded that Alcan had some evidence involving Strain in vandalism but did not go into detail about the evidence. Later, some months after Strain had been terminated, Acosta ran into former co-workers who had been laid off from Alcan in the cafeteria at UCC where they were all attending school. Acosta and one of his former co-workers discussed that they believed Strain had been wrongly blamed for the graffiti incident, and the former co-worker told Acosta the name of the employee who he believed had actually defaced Acosta's locker. Acosta ran into Strain at the grocery store after this conversation and told Strain the name of the employee who Acosta believed had defaced the locker.

When Alcan terminated Strain's employment, he completed an "Employee Authorization for

Release of Information" form, which allowed him what information Alcan is authorized to release.

Strain specified that Alcan could only release his dates of employment and position(s) held. Alcan

employee Mikaela Baird (Baird) is assigned to respond to all requests for information on former

employees by prospective employers. Baird maintains a log of all such requests. According to the

log, Alcan received one request for information about Strain on April 27, 2010. The caller indicated

that Strain had said he was terminated and involved in a lawsuit with Alcan. The log indicates that

Baird told the caller she could not comment. Greer followed up with the caller and told the person

with whom she spoke that she could only release Strain's dates of employment and positions he held.

Greer did not divulge the reasons for Strain's termination.

Strain filed a state court action against defendants alleging defamation and false light claims.

Defendant moved the action to federal court based on diversity jurisdiction and now moves for

summary judgment on both of plaintiff's claims. The parties have consented to allow a Magistrate

Judge to decide this case in accordance with Fed. R. Civ. P.73 and 28 U.S.C. § 636(c). For the

reasons set forth below, I grant the motion for summary judgment.

## STANDARDS

Federal Rule of Civil Procedure 56 allows the granting of summary judgment:

> if the pleadings, the discovery and disclosure materials on file, and any affidavits
> show that there is no genuine issue as to any material fact and that the movant is
> entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c). There must be no genuine issue of material fact. Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 247-48 (1986).

The movant has the initial burden of establishing that no genuine issue of material fact exists

or that a material fact essential to the nonmovant's claim is missing. Celotex Corp. v. Catrett, 477

Page 5 - OPINION AND ORDER

U.S. 317, 322-24 (1986). Once the movant has met its burden, the burden shifts to the nonmovant

to produce specific evidence to establish a genuine issue of material fact or to establish the existence

of all facts material to the claim. Id.; see also, Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1409 (9th

Cir. 1991); Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1105 (9th Cir.

2000). In order to meet this burden, the nonmovant "may not rely merely on allegations or denials

in its own pleading," but must instead "set out specific facts showing a genuine issue of fact for

trial." Fed. R. Civ. P. 56(e).

Material facts which preclude entry of summary judgment are those which, under applicable

substantive law, may affect the outcome of the case. Anderson, 477 U.S. at 248. Factual disputes

are genuine if they "properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party." Id. On the other hand, if, after the court has drawn all

reasonable inferences in favor of the nonmovant, "the evidence is merely colorable, or is not

significantly probative," summary judgment may be granted. Id.

## DISCUSSION

Alcan argues that because Strain cannot establish a primae facie case of either defamation

or false light, it is entitled to judgment as a matter of law.

A.    **Defamation**

In order to establish a defamation claim under Oregon law, Strain must establish that

defendant communicated defamatory statements about him to a third party. Wallulis v Dymowski,

323 Or. 337, 343 (1996). A statement is communicated (or "published," which is the technical legal

term) only when it is communicated to a third party. Id.

Here, Strain cannot establish that Alcan communicated to a third party that Strain wrote the

Page 6 - OPINION AND ORDER

graffiti on the locker. The record establishes that Alcan did not communicate the reason for Strain's termination outside of the management involved in the investigation of the incident and decision to terminate. There is no dispute that when approached by Strain's co-workers about his termination, Alcan management declined to comment. Similarly, it is not disputed that Alcan declined to discuss the reason for Strain's termination with the prospective employer who contacted Alcan. In his response in opposition to summary judgment and at oral argument, Strain argued that he has established the communication element of a defamation claim because Alcan communicated defamatory statements about him when Greer told Acosta that Alcan had evidence that Strain was involved with the vandalism. Strain also asserted that Alcan's firing of Strain was a communication to other employees that Strain vandalized the locker. These arguments are not persuasive.

Under Oregon law, a qualified privilege protects a communication from defamation liability if: "'(1) it was made to protect the interests of defendants; (2) it was made to protect the interest of plaintiff's employer; or (3) it was on a subject of mutual concern to defendants and the persons to whom the statement was made.'" Wattenburg v. United Med. Lab., 269 Or. 377, 380 (1974) (internal citations omitted). The qualified privilege applies to an employer's communications to employees regarding the reason another employee was terminated. Downs v. Waremart, Inc., 137 Or. App. 119 (1995) rev'd in part on other grounds, 324 Or. 307 (1996) (privilege applies where employer told plaintiff's co-workers that plaintiff was terminated for theft to show that theft was not allowed). Even assuming that Alcan had communicated to Strain's co-workers why he was fired, such communications would have been protected by the qualified privilege. Id. Certainly, an employee is entitled to let other employees know that racist graffiti is not tolerated in the workplace–even if the underlying reason for that is, as Strain alleges, fear of litigation based on a

Page 7 - OPINION AND ORDER

hostile work environment.

A plaintiff may only overcome the qualified privilege if he can show that the defendant abused it. Wallulis, 323 Or. at 348. If a defendant acts in good faith, without malice, there is no abuse of the privilege. DeLong v. Yu Enterprises, Inc..334 Or. 166, 170 (2002). If however, plaintiff can establish that defendant knew the statements were false, that would show the privilege was abused. Walsh v. Consol Freightways, 278 Or. 347, 355 (1977). Here, the record establishes that Alcan conducted an immediate and thorough investigation, basing their conclusion that Strain wrote the graffiti on several sources–the discrepancy in interviews, the marker in the locker, the handwriting analysis, the opportunity to write on the locker. Moroever, the record establishes that the Alcan managers who investigated the graffiti incident, concluded that Strain vandalized the locker and made the decision to terminate him believed at the time, and still believe, that Strain wrote the graffiti. Although Strain has presented evidence that Acosta did not believe Strain wrote the graffiti, he has not established that Alcan managers acted with malice or knew the conclusion that Strain wrote the graffiti was false.

Strain has not established that Alcan communicated a defamatory statement about him to a third party. Accordingly, his defamation claim fails as a matter of law.

**B.    False Light**

A false light claim is "akin to defamation , because it leads other to believe something about that person which is not true." Dean v. Guard Pub. Co., Inc., 73 Or. App. 656, 659 (1985). To establish a false light claim, Strain must show that: (1) Alcan gave publicity to a matter that placed him  before the public in a false light; (2) the false light in which he was placed would be highly offensive to a reasonable person; and (3) Alcan had "knowledge of or acted in reckless disregard as

to the falsity of the publized [sic] matter and the false light in which [Strain was] placed." Id.

As discussed above, Strain has not established that Alcan communicated the reasons for his termination to any third party. Moreover, even if Alcan had placed Strain in a false light before the public, Strain cannot establish that Alcan acted with malice. Instead the record shows that Alcan conducted a immediate and thorough investigation, and based on evidence acquired during the investigation, concluded that Strain had written the graffiti. Alcan's managers sincerely believed that Strain vandalized Acosta's locker. Even if their belief was incorrect, the managers' good faith and lack of malice precludes any recovery for false light.

## CONCLUSION

I grant Alcan's motion for summary judgement (dkt. #13) on all of Strain's claims against them. The Clerk of the Court is directed to enter judgment and dismiss this case with prejudice.

IT IS SO ORDERED

DATED this _3_ day of December 2010.

_____
THOMAS M. COFFIN
United States Magistrate Judge